IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:16-CV-166-D

| | |
|---|---|
| JD SOLAR SOLUTIONS, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| TRABANT SOLAR, INC., and ) | |
| ROVSHAN SADE a/k/a RON SADE, ) | |
| ) | |
| Defendants. ) | |

On April 11, 2016, JD Solar Solutions, LLC ("JD Solar" or "plaintiff") filed a complaint against Trabant Solar, Inc. ("Trabant") and Rovshan Sade a/k/a Ron Sade ("Sade"; collectively, "defendants") for breach of contract, piercing the corporate veil, and violation of North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1 et seq. [D.E. 1]. On June 3, 2016, defendants answered and alleged counterclaims for breach of contract and a UDTPA violation [D.E. 14]. On June 24, 2016, JD Solar answered defendants' counterclaims [D.E. 16]. On March 23, 2017, the court struck Trabant's answer and counterclaims because Trabant, a corporation, failed to retain counsel [D.E. 30].

On March 15, 2018, defendants answered the complaint [D.E. 36]. On February 4, 2019, JD Solar moved for summary judgment [D.E. 46], filed a statement of material facts [D.E. 47], and filed a memorandum in support [D.E. 48]. On March 7, 2019, defendants responded in opposition [D.E. 50–52]. On April 1, 2019, JD Solar replied [D.E. 55]. On April 1, 2019, Sade voluntarily dismissed his counterclaims with prejudice [D.E. 54]. As explained below, the court denies JD Solar's motion for summary judgment.

I.

JD Solar, a limited liability company formed under Connecticut law, sells solar panel technologies for both residential and commercial applications. See [D.E. 47] ¶ 1; Dean Decl. [D.E. 48-1] ¶ 3. Sade resides in North Carolina. See [D.E. 47] ¶ 2; [D.E. 52] ¶ 2. Trabant is a North Carolina corporation. See [D.E. 47] ¶ 3; [D.E. 52] ¶ 3. Trabant develops and sells "solar trackers," which enable solar panels to rotate in response to or "track" the sun's movements to maximize solar energy intake. See Sade Decl. [D.E. 50] ¶ 2.

In July 2014, James Dean ("Dean"), a founding member of JD Solar, inquired online about Trabant's solar tracker products. See [D.E. 47] ¶ 5; Dean Decl. [D.E. 48-1] ¶¶ 1, 4. Sade responded to Dean's inquiry. See [D.E. 47] ¶ 6; Sade Decl. [D.E. 50] ¶¶ 3–4. In July 2014, JD Solar alleges, but defendants deny, that Sade sent a non-binding quotation to Dean to purchase 13 solar trackers. See [D.E. 47] ¶ 7; [D.E. 52] ¶ 7. JD Solar claims that it planned to use one tracker for a residential project in Connecticut and the remaining twelve for a commercial project in Connecticut. See [D.E. 47] ¶ 7. On October 2, 2014, Sade sent a binding quotation for 12 trackers at a price of $13,000 per tracker and $950 for a gravel pan for each tracker. See [D.E. 47] ¶ 7; [D.E. 52] ¶ 13. This price included shipping, installation, and a warranty. See [D.E. 47] ¶ 8. JD Solar alleges that Sade told Dean that he could deliver the 12 trackers within 12 weeks, which is a standard time-frame in the industry. See id. ¶ 9.

Sade claims that Dean came to Fort Lauderdale, Florida, to view some of Trabant's solar trackers installed on the campus of Florida Atlantic University. See Sade Decl. [D.E. 50] ¶ 6. They met at the rental car center, but because Sade "had problems renting the car" with his debit card, Dean rented the car. See id. Sade alleges that Trabant's solar trackers impressed Dean, and Dean spoke positively about Trabant's work to one of JD Solar's clients. See id. ¶ 7. Sade claims that,

2

at this initial meeting, he told Dean that Trabant, as a small start-up, had limited funds and therefore would require 100% payment up-front. See id. ¶¶ 8, 10–12. JD Solar alleges, instead, that Sade promised to send a payment and delivery schedule and that JD Solar agreed to make a down payment. See [D.E. 47] ¶ 10.

JD Solar made a series of payments between October 3, 2014, and December 22, 2015. See id. ¶ 11; [D.E. 52] ¶ 11. The payments totaled $217,170.00. See [D.E. 47] ¶ 11. JD Solar claims that it sent the last three payments as loans. See id. ¶ 12; [D.E. 48-4]. Defendants claim they "never agreed to any loans." [D.E. 52] ¶ 11. Rather, defendants contend that JD Solar did not provide sufficient funding for Sade to complete the commercial project because JD Solar told Sade to divert funds from the commercial project to the residential project. See id. ¶ 12.

The parties dispute numerous facts concerning the initial negotiations. First, Sade claims that JD Solar originally requested a quote for 13 solar trackers to be used for the commercial project. See Sade Decl. [D.E. 50] ¶ 16. Because JD Solar's plan allegedly "failed to take into account the installation matrix requested by" JD Solar's client (i.e., the physical arrangement of the trackers in three or four equal rows), defendants claim that JD Solar eventually "gave up" on the 13-tracker plan and changed the order for the commercial project to 12 trackers. Id. ¶¶ 18–19. Sade claims that the binding quotation did not include any provision for trackers at the residential project and only included 12 trackers for the commercial installation and that delivery would occur a few months after payment. See id. ¶¶ 21, 23. Second, defendants contend that if Trabant had known that JD Solar would not agree to purchase solar panels and inverters, the per unit price of the trackers would have been higher than $13,000. See id. ¶ 22. Sade also claims that JD Solar changed the physical arrangement of the trackers for the commercial project in a manner that increased the project's costs beyond the original price. See id. ¶ 36.

3

Eventually, JD Solar began to pressure defendants to explain the delays in delivering the trackers for the commercial project. See [D.E. 47] ¶ 13. In June 2015, Sade sent two trackers for the residential project that JD Solar characterizes as "smaller, used[,] and mismatched." Id. Defendants claim that JD Solar instructed them to provide the two trackers for the residential project and to divert funds from the commercial project to the residential project. See [D.E. 52] ¶ 13. In contrast, Dean claims that he "discussed one tracker to be used" for the residential project, but that the "main project" was the commercial project. Dean Aff. [D.E. 48-1] ¶ 7. Defendants claim that the goods and services provided for the residential project totaled $150,533.15 in value. See [D.E. 52] ¶ 12. Defendants also claim that these two trackers were functional and that JD Solar accepted them. See id. ¶ 13. Defendants never delivered the 12 trackers for the commercial project. See [D.E. 47] ¶ 13; cf. [D.E. 52] ¶ 13.

JD Solar claims that Sade attempted to charge more money for items that were originally included in the unit price. See Dean Aff. [D.E. 48-1] ¶ 10. Defendants respond that the unit price would have been higher if additional items had been included. See [D.E. 52] ¶ 13. Defendants also claim that, as for the residential project, JD Solar increased the costs for the delivery and installation of the two trackers by turning the trackers in different directions and using A/C, and not D/C, power. See id.

JD Solar asserts that defendants' bank records from Wells Fargo show that defendants did not pay for the manufacture of the solar trackers ordered by JD Solar. See [D.E. 47] ¶ 14. JD Solar contends that the bank records show that, after each progress payment from JD Solar, Sade withdrew funds that he then used for personal expenses unrelated to JD Solar or Trabant's business. See id. ¶¶ 14–16, 19. Defendants dispute whether Sade used funds wired from JD Solar's accounts for his personal expenses. See [D.E. 52] ¶ 14. Instead, defendants assert that Sade used the money

4

withdrawn to pay Trabant's general operating expenses, including expenses for JD Solar's orders of solar trackers for the commercial and residential projects. See id. ¶¶ 14, 19. Defendants claim that, although they had "some copies" of cashier's checks used to pay Trabant business expenses, they "no longer have copies of others and Wells Fargo was unable to provide copies" to either party. Id. ¶ 19.

The parties also dispute the events leading to defendants' use of a Polish manufacturer. Defendants claim that Trabant initially arranged for a fabricator in Trinity, Texas, to make the 12 trackers that JD Solar ordered for the commercial project. See [D.E. 50] ¶ 43. Defendants claim that the fabricator required advance payment of $120,000 to manufacture the trackers within two or three months. See id. Because JD Solar did not pay in full up front, defendants were unable to make this advance payment. See id. ¶ 44. Although Sade "tried every imaginable route to identify another fabricator who would be willing to make the [t]rackers at [a] price and timeframe suitable" to complete the commercial project, his efforts proved unsuccessful. Id. ¶ 45. Consequently, Sade arranged for a Polish manufacturer, Telemond Holdings ("Telemond"), to make the trackers. See id. ¶¶ 48–49. According to defendants, JD Solar refused to tender an additional $60,000 needed to manufacture the trackers and contacted Telemond directly to cut out Trabant entirely. See id. ¶¶ 49–51.

In contrast, JD Solar claims that Sade emphasized that the manufacturer was domestic in the initial negotiations. See Dean Decl. [D.E. 48-1] ¶ 13. Dean claims that, when he pressured Sade to allow him to go to the Texas manufacturer, Sade said that the "welds were bad" and that he had to use Telemond instead. See id. JD Solar claims that when Dean visited Telemond in early 2016, "it was obvious that the trackers had not been manufactured" and that the meeting was merely

5

introductory. Dean Aff. [D.E. 55-1] 7–8; see Dean Decl. [D.E. 48-1] ¶ 16.[1] In support, JD Solar cites contemporaneous e-mails in which Sade told Telemond employees not to "provide details" to JD Solar's representatives about progress on the manufacturing order for the trackers. See [D.E. 48-3] 2; see Dean Decl. [D.E. 48-1] ¶ 17. JD Solar claims that defendants, at that time, had not made any progress on the 12 trackers for the commercial installation and that Sade's representations of progress were "lies." Id. ¶ 15.

II.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Scott v. Harris, 550 U.S. 372, 378 (2007).

---

[1] JD Solar claims that, because Sade did not have enough money to pay for his travel expenses to Poland, JD Solar paid for his flight and other expenses totaling $7,127.12. See Dean Decl. [D.E. 48-1] ¶¶ 14, 18; Sade Decl. [D.E. 50] ¶ 6. JD Solar seeks damages for these expenses.

6

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of plaintiff's position [is] insufficient...." Id. at 252.; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

Subject-matter jurisdiction is based on diversity of citizenship, and the court applies state substantive law and federal procedural rules. See Erie R.R. v. Tompkins, 304 U.S. 64, 78–80 (1938); Dixon v. Edwards, 290 F.3d 699, 710 (4th Cir. 2002). North Carolina law applies. Accordingly, this court must predict how the Supreme Court of North Carolina would rule on any disputed state-law issues. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from that court, this court may consider the opinions of North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted).[2] In predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); see Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999). Moreover, in analyzing an issue not yet resolved by a state's highest court, this court must "follow the decision

---

[2] North Carolina does not have a mechanism to certify questions of state law to its Supreme Court. See Town of Nags Head v. Toloczko, 728 F.3d 391, 397–98 (4th Cir. 2013).

7

of an intermediate state appellate court unless there [are] persuasive data that the highest court would decide differently." Toloczko, 728 F.3d at 398 (quotation omitted).

A.

As for JD Solar's breach of contract claim, see Compl. [D.E. 1] ¶¶ 30–32, under North Carolina law, a breach of contract claim involves two elements: (1) the existence of a valid contract and (2) breach of the terms of that contract. See McLamb v. T.P. Inc., 173 N.C. App. 586, 588, 619 S.E.2d 577, 580 (2005); Poor v. Hill, 138 N.C. App. 19, 26, 530 S.E.2d 838, 845 (2000). "Non-performance of a valid contract is a breach thereof unless the person charged shows some valid reason which may excuse the non-performance; and the burden of doing so rests upon him." Cater v. Barker, 172 N.C. App. 441, 447, 617 S.E.2d 113, 117 (2005), aff'd, 360 N.C. 357, 625 S.E.2d 778 (2006) (quotation and alterations omitted); see, e.g., Blount-Midyette v. Aeroglide Corp., 254 N.C. 484, 488, 119 S.E.2d 225, 228 (1961); Abbington SPE, LLC v. U.S. Bank, Nat'l Assoc., 352 F. Supp. 3d 508, 517 (E.D.N.C. 2016), aff'd, 698 F. App'x 750 (4th Cir. 2017) (per curiam) (unpublished). "[T]he terms of a contract are to be interpreted according to the expressed intent of the parties unless such intent is contrary to law." Offiss, Inc. v. First Union Nat'l Bank, 150 N.C. App. 356, 363, 562 S.E.2d 905, 910 (2002); see Lane v. Scarborough, 284 N.C. 407, 410–11, 200 S.E.2d 622, 624 (1973); Duke Power Co. v. Blue Ridge Elec. Membership Corp., 253 N.C. 596, 602, 117 S.E.2d 812, 816 (1961).

A contract existed between the parties; however, the parties dispute the terms of that contract and whether each party performed or breached its obligations under the contract. Genuine issues of material fact exist concerning JD Solar's breach of contract claim. Accordingly, the court denies JD Solar's motion for summary judgment on its breach of contract claim.

B.

As for JD Solar's UDTPA claim, see Compl. [D.E. 1] ¶¶ 38–43, to prevail on a UDTPA claim, a plaintiff must establish that "(1) [the] defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." Dalton v. Camp, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001); Gray v. N.C. Ins. Underwriting Ass'n, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000); Spartan Leasing Inc. v. Pollard, 101 N.C. App. 450, 460–61, 400 S.E.2d 476, 482 (1991). Whether an act or practice is unfair or deceptive is a question of law for the court. See Gray, 352 N.C. at 68, 529 S.E.2d at 681. A practice is deceptive "if it has the tendency to deceive." Id.; see Marshall v. Miller, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981). A practice is unfair "when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to customers." Marshall, 302 N.C. at 548, 276 S.E.2d at 403.

Under North Carolina law, a "mere breach of contract, even if intentional, is not an unfair or deceptive act" by itself. Bob Timberlake Collection, Inc. v. Edwards, 176 N.C. App. 33, 42, 626 S.E.2d 315, 323 (2006); see PCS Phospate Co. v. Norfolk S. Co., 559 F.3d 212, 224 (4th Cir. 2009); Walker v. Fleetwood Homes of N.C., Inc., 362 N.C. 63, 72, 653 S.E.2d 393, 399 (2007); Gray, 352 N.C. at 75, 529 S.E.2d at 685; Branch Banking & Tr. Co. v. Thompson, 107 N.C. App. 53, 62, 418 S.E.2d 694, 700 (1992). North Carolina law "does not permit a party to transmute a breach of contract claim into a . . . UDTPA claim . . . because awarding punitive or treble damages would destroy the parties' bargain." PCS Phosphate, 559 F.3d at 224; see Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 346–47 (4th Cir. 1998) (collecting cases). If substantial aggravating circumstances accompany a breach of contract, then those circumstances can give rise to a UDTPA claim. See Bartolomeo v. S.B. Thomas, Inc., 889 F.2d 530, 535 (4th Cir. 1989); United

9

Roasters, Inc. v. Colgate-Palmolive Co., 649 F.2d 985, 992 (4th Cir. 1981); Burrell v. Sparkkles Reconstruction Co., 189 N.C. App. 104, 111, 657 S.E.2d 712, 717 (2008); Branch Banking & Tr. Co., 107 N.C. App. at 62, 418 S.E.2d at 700.

Genuine issues of material fact exist concerning whether defendants committed an unfair or deceptive act and whether substantial aggravating circumstances exist. Thus, the court denies JD Solar's motion for summary judgment on its UDTPA claim.

C.

JD Solar also moves for summary judgment on defendants' counterclaims. See [D.E. 46]. On March 23, 2017, the court struck Trabant's counterclaims [D.E. 30]. On April 1, 2019, Sade voluntarily dismissed his counterclaims with prejudice [D.E. 54]. Accordingly, the court denies as moot JD Solar's motion for summary judgment on defendants' counterclaims.

III.

In sum, the court DENIES JD Solar's motion for summary judgment concerning its claims and DENIES as moot JD Solar's motion concerning defendants' counterclaims [D.E. 46]. The parties shall engage in a settlement conference with United States Magistrate Judge Gates. The court will set the case for trial by separate order.

SO ORDERED. This  9  day of July 2019.

JAMES C. DEVER III
United States District Judge

10